# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>caitmart96@icloud.com and martinez.caitlyn@gmail.com, both<br>of which are associated with phone number 818-731-7926, that<br>are within the possession, custody, or control of Apple Inc. | Case No.  2:21-MJ-05726 |

**APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703**

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

        ☑ Evidence of a crime;
        ☑ Contraband, fruits of crime, or other items illegally possessed;
        ☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution and Possession with Intent to Distribute Controlled Substances, Resulting in Death |
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*Jaquilla Wright*
*Applicant's signature*

Jaquilla Wright, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

*Judge's signature*

Hon. Gail J. Standish, U.S. Magistrate Judge
*Printed name and title*

AUSA: Ashley Fillmore: 213-894-2416

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the Apple accounts (the "SUBJECT ACCOUNTS"), that are stored at premises owned, maintained, controlled, or operated by Apple, Inc. (the "PROVIDER"), a provider of electronic communications and remote computing services, that receives legal process at One Apple Park Way, M/S 169-5CLP, Cupertino, California, 95014-2084, regardless of where such information is stored, held, or maintained:

1. caitmart96@icloud.com ("SUBJECT ACCOUNT 1"), which is associated with phone number 818-731-7926; and

2. martinez.caitlyn@gmail.com ("SUBJECT ACCOUNT 2"), which is associated with phone number 818-731-7926.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

**I. SEARCH PROCEDURES**

1.    The warrant will be presented to personnel of Apple, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant. The search shall extract and seize only the specific items to be seized under this warrant (see Section III below). The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other

sophisticated techniques. The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant. The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNTS listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred between August 1, 2020 and the date of this warrant,[3] including:

i.    All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNTS, including stored

_____

[3] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

or preserved copies of messages sent to and from the account,
draft messages, deleted messages, and messages maintained in
trash or any other folders or tags or labels, as well as all
header information associated with each email or message
(including the actual IP addresses of the sender and recipients
of the emails), and any related documents or attachments.

ii.  All records or other information stored by
subscriber(s) of the SUBJECT ACCOUNT, including address books,
contact and buddy lists, calendar data, pictures, videos, notes,
texts, links, user profiles, account settings, access logs, and
files.

iii. All records pertaining to communications
between the PROVIDER and any person regarding the SUBJECT
ACCOUNT, including contacts with support services and records of
actions taken.

iv.  All stored files and other records stored on
iCloud for each SUBJECT ACCOUNT, including all iOS device
backups, all Apple and third-party app data, all files and other
records related to iCloud Mail, iCloud Photo Sharing, My Photo
Stream, iCloud Photo Library, iCloud Drive, iWorks (including
Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain,
and all address books, contact and buddy lists, notes,
reminders, calendar entries, images, videos, voicemails, device
settings, and bookmarks;

v.   All files, keys, or other information
necessary to decrypt any data produced in an encrypted form,

when available to Apple (including, but not limited to, the
keybag.txt and fileinfolist.txt files).

      b.   All other records and information, including:

      i.   All subscriber information, including the
date on which the account was created, the length of service,
the IP address used to register the account, the subscriber's
full name(s), screen name(s), any alternate names, other account
names or email addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,
including detailed billing records, **and including any changes
made to any subscriber information** or services, including
specifically changes made to secondary email accounts, phone
numbers, passwords, identity or address information, or types of
services used, and including the dates on which such changes
occurred, for the SUBJECT ACCOUNTS.

      ii.   All activity, connection, and transactional
logs for all activity relating to each SUBJECT ACCOUNT described
above in Section II.10.a. (all log files, dates, times,
durations, data transfer volumes, methods of connection,
authentication logs, IP addresses, ports, routing information,
dial-ups, and locations), including FaceTime call invitation
logs, mail logs, iCloud logs, iTunes Store and App Store logs

(including purchases, downloads, and updates of Apple and third-party apps), messaging and query logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My logs, logs associated with device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers);

iii. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files);

iv.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

## III. <u>INFORMATION TO BE SEIZED BY THE GOVERNMENT</u>

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances, Resulting in Death) and 846 (Conspiracy

and Attempt to Distribute Controlled Substances) (collectively, the "Subject Offenses"), namely:

i.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS, iMessage, email communications or other text or written communications sent to or received which relate to the trafficking of controlled substances, or the collection, transfer or laundering of the proceeds of illegal activities;

ii.    Data, records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when controlled substances, were bought, sold, or otherwise distributed;

iii. Audio recordings, pictures, video recordings or still captured images related to the purchase, sale, transportation, or distribution of controlled substances, or the collection, transfer or laundering of the proceeds of illegal activities;

iv.   Contents of any calendar, date book, or contact or buddy lists;

v.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

vi.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show SMS, iMessage, email communications or other text or
written communications sent to or received which relate to the
overdose death of any person, including without limitation, C.M.

      b.   Information relating to who created, accessed, or
used the SUBJECT ACCOUNTS, including records about their
identities and whereabouts;

      c.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS, iMessage, email communications or other text or
written communications sent to or received which relate to the
use of controlled substances;

      d.   Information relating to or reflecting the
identities of any co-conspirators in the Subject Offenses,
including their whereabouts, any Internet accounts or services
used by such persons and any coordination efforts;

      e.   All records and information described above in
Section II.10.b.

## IV.  PROVIDER PROCEDURES

12.  IT IS ORDERED that the PROVIDER shall deliver the
information set forth in Section II within 10 days of the
service of this warrant. The PROVIDER shall send such
information to:

    SA Jaquilla Wright
    1340 W. 6th Street, Los Angeles, CA, 90017
    213-369-4337
    Jaquilla.Wright@dea.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

**AFFIDAVIT**

I, Jaquilla Wright, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA"), and have been so employed since November 2020. I am a SA in the DEA's Los Angeles Field Office and have served in this capacity since January 2021. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") division and am a member of the Tactical Diversion Squad ("TDS") 2, which is tasked with, among other things, investigating diversion related crimes and suspected opioid-related overdose deaths in Los Angeles County.

2.   I attended 14 weeks of specialized training in Quantico, Virginia, where I received training in drug trafficking, report writing, criminal law and procedure, confidential source management, money laundering, undercover operations, and surveillance operations. While working for DEA, I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics and other controlled substances, and conspiracies associated with narcotics and controlled substance offenses. I have also participated in the execution of search and arrest warrants involving drug trafficking and money laundering crimes.

3.   During my employment with the DEA, I have become familiar with drug crimes, drug offenders, and the daily

operations and common practices of drug trafficking organizations.

## II.   <u>PURPOSE OF AFFIDAVIT</u>

4.   I make this affidavit in support of an application for a search warrant for information that is stored at premises controlled by Apple Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, which accepts service of legal process at One Apple Park Way, M/S 169-5CLP, Cupertino, California 95014-2084, related to the following accounts, which are believed to be used by victim C.M.: caitmart96@icloud.com ("SUBJECT ACCOUNT 1"); and martinez.caitlyn@gmail.com ("SUBJECT ACCOUNT 2"), both of which are associated with phone number 818-731-7926.[1]

5.   The information to be searched is described in Attachment A and the information sought is from August 1, 2020 to present. This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A),

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). <u>See</u> 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B. Attachments A and B are incorporated herein by reference.

6.   As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 21 U.S.C. § 841 (distribution and possession with intent to distribute controlled substances, resulting in death) and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent

---

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d). To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena. See 18 U.S.C. § 2703(c)(1), (c)(2). To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d). The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

to distribute controlled substances) (collectively, the "Subject Offenses").

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

8.    On November 5, 2020, victim C.M. was discovered to have overdosed at the victim's residence in North Hollywood, California and died of mixed toxicology comprised of fentanyl and ethanol. C.M.'s family members, with whom C.M. resided, observed an unidentified male arrive at the residence after midnight and leave the following morning before C.M.'s overdose was discovered. A friend of C.M. identified an individual named "Brad" as a fentanyl user with whom C.M. interacted, who may have supplied the narcotics to C.M. on or about November 5, 2020.

9.    The contents of the SUBJECT ACCOUNTS are likely to assist law enforcement in identifying the supplier of the drugs that led to C.M.'s overdose as well as the events of November 5, 2020.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   **Victim C.M. Found Deceased of Fentanyl Overdose**

11.   After reading a Los Angeles Police Department ("LAPD") report, divisional record number 2015-17250, I learned the following:

a.   On November 5, 2020, LAPD officers responded to 11536 Killion Street, North Hollywood, California, for the suspected overdose of a 24-year-old female, victim C.M. Paramedics pronounced C.M. deceased.

b.   Upon the LAPD officer's arrival, they observed C.M. in the garage bedroom. LAPD officers observed post-mortem lividity on C.M.'s body and frothy sputum exuding from both nostrils and mouth, indicative of an overdose. LAPD officers did not observe any obvious signs of physical trauma to C.M.'s body, or any evidence of foul play.

c.   LAPD officers also observed numerous pill bottles near C.M.'s desk and dresser area, which appeared to be prescribed by a Kaiser Permanente physician. Officers also observed a vape pen filled with an unknown liquid amber-colored substance situated on the windowsill by the bed near C.M.'s body.

d.   C.M.'s mother, T.E., informed LAPD officers that C.M. was diagnosed with Asperger Syndrome and Attention Deficit

Hyperactivity Disorder ("ADHD"), and was taking several prescribed medications for C.M.'s condition for approximately five years. T.E. informed LAPD officers that medical staff had switched up C.M.'s medication in the past week and T.E. feared this might have been the cause of C.M.'s death. T.E. further informed LAPD officers C.M. had been in rehab several months earlier for an addiction to her ADHD medication and C.M. had not tested positive for any other drugs at that time.

12.   After reviewing the Los Angeles County Department of Medical's Examiner Coroner Office case report 2020-10336, I learned C.M. had approximately 22ng/mL of fentanyl in C.M.'s system near the time of C.M.'s death. The autopsy report states that C.M. died of mixed toxicology comprised of fentanyl and ethanol.

### B.   C.M.'s Family Members Observed an Unidentified Male Visiting C.M. on November 5, 2020

13.   I understand from LAPD officers that C.M. lived in the detached garage at C.M.'s parent's residence. LAPD officers spoke to C.M.'s sister, who stated that she had last seen C.M. alive the evening prior around midnight.

14.   I know from others involved in the investigation that LAPD spoke to C.M.'s family members, who stated that a male friend of C.M. had visited C.M. sometime after midnight on November 5, 2020. C.M.'s family members stated that they did not know who this male was but suspected he might be a friend C.M. met at rehab. C.M.'s sister stated the male drove a dark colored SUV with a white Alcoholics Anonymous decal in the rear center

windshield. T.E. stated that she recalled seeing this male leave at approximately 9:50 a.m. the morning of November 5, 2020.

15.  I reviewed security camera footage from C.M.'s neighbor, which shows a dark colored SUV parking at C.M.'s residence at approximately 3:42 a.m. on November 5, 2020 and leaving at approximately 9:54 a.m. on that same day.

16.  T.E. showed LAPD officers a blurry photo of what appeared to be a white male in the outside rear walkway behind the window of the dining room. T.E. stated at approximately 2:30 p.m., she went to C.M.'s room in the garage to deliver a package that had arrived for C.M. T.E. stated she observed C.M. who appeared to be deceased in the bed, with C.M.'s shirt pushed up, exposing C.M.'s breasts and C.M.'s boxer shorts down to C.M.'s ankles, exposing C.M.'s vagina.

17.  C.M.'s family members expressed concern to LAPD officers about the state in which C.M. was found because this male appeared to be the last person to see C.M. alive and did not notify anyone of C.M.'s condition. He also appeared to rush out of the residence hours before C.M. was found deceased. A sexual assault kit was processed by the Coroner's investigator and Coroner's criminalists on scene. On November 11, 2020, LAPD officers received a call from Los Angeles medical examiner Dr. Nguyen informing LAPD officers that C.M.'s autopsy revealed no signs of trauma internally or externally to C.M.'s body and no trauma to C.M.'s genital area.

### C.   C.M.'s Friends Identify a Possible Source of Drugs Leading to C.M.'s Overdose

18.   LAPD officers spoke to a friend of C.M. named C.C. C.C. told LAPD officers that on October 31, 2020, C.M. told C.C. that C.M. wanted to try fentanyl, and appeared to be influenced to this because C.M.'s close friend from rehab, "Brad" was addicted to it.

19.   C.C. also stated that at one point, C.M. had attempted to get Brad help for his addiction by asking another mutual friend to sponsor Brad in Alcoholics Anonymous. According to C.C., C.M. told a mutual friend that Brad was not ready to get sober and was still addicted to fentanyl. C.C. received a screenshot of the mutual friend's conversation with C.M. I reviewed a screenshot of the iMessage conversation between C.M. and the mutual friend, which reads as follows:

> Friend: Hey!
>
> C.M.: I didn't think Brad is going to contact you because after our call he told me he's not actually sober.
>
> Friend: Oh FoSho
>
> Friend: Yea I figured cuz he never called me
>
> C.M. Yeah he was at my house and he told me he was high on fentanyl!! Crazy. Who gets high on that without a death wish
>
> Friend: lol dude that's crazy
>
> Friend: Fentanyl is no joke

20.   Additionally, C.C. recalled seeing a notification on C.M.'s phone from a contact called "Brad TTC." C.C. believed it

to be "Brad" from rehab because "TTC" stood for Tarzana
Treatment Center, where C.M. attended rehab.

21.  C.C. inspected C.M.'s friend list on Instagram and
found a profile for Brad Silver with the Instagram handle
"bsilverrr." C.C. friended a person named Brad Silver on
Facebook who used the same profile picture as "bsilverrr" on
Instagram. I reviewed a screenshot of a Facebook messenger
conversation between C.C. and Brad Silver, in which C.C.
attempted to notify Brad Silver of the news regarding C.M.'s
death. However, Brad Silver responded that he did not know who
C.C. was and blocked C.C. immediately. Law enforcement confirmed
that Brad Silver was friends with C.M. on Facebook.

### D.   C.M.'s Family Consents to Search of Victim C.M.'s Cellphone

22.  On November 12, 2020, C.M.'s mother provided law
enforcement written consent to search C.M.'s cellphone. Law
enforcement attempted to conduct a digital download of C.M.'s
cellphone but was unsuccessful. However, law enforcement was
able to identify the iCloud accounts associated with the cell
phone number for C.M.'s device: caitmart96@icloud.com and
martinez.caitlyn@gmail.com.

### E.   The SUBJECT ACCOUNTS Are Likely to Contain Relevant Content

23.  I believe that the SUBJECT ACCOUNTS are likely to
contain additional information relevant to this investigation.
Specifically, I believe the information from the SUBJECT
ACCOUNTS will contain information that will identify the person
who sold C.M. the fentanyl pills that caused C.M.'s death and

may confirm SILVER as the individual who distributed and/or
conspired to distribute controlled substances to C.M. on or
about the day of C.M.'s death. I believe the SUBJECT ACCOUNTS
could contain a backup of historical information that may have
been deleted during the course of this investigation, including
notes, text messages, social media information, or photographs
that would be useful to the investigation, including to help
identify C.M.'s suppliers, co-conspirators, and customers. I
further believe the SUBJECT ACCOUNTS could contain geographical
information, possibly leading investigators to know the
locations of C.M.'s suppliers, potential stash houses, or other
information relevant to the investigation.

24.   Based on my training and experience, and my
conversations with other investigators experienced in narcotics
investigation, individuals engaged in the Subject Offenses often
use text messages and messaging services (including Apple
iMessage), email, social media, and other services similar to
those offered by the PROVIDER (as described more fully below) to
further their criminal activities. Further, drug dealers often
save and share photographs of their drugs, as well as cash
associated with drug dealing, on their phones and through
messaging services such as those provided by the PROVIDER.
Additionally, based on my training and experience investigating
narcotics traffickers, I know that it is common for such
individuals to communicate with criminal associates on encrypted
applications. Communications on these applications can be viewed
on the actual device, or, if law enforcement is not in

possession of the actual device, could potentially be available and viewed if the communications are backed up to a cloud server, such as iCloud.

## V.   REQUEST FOR NON-DISCLOSURE

25.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States. There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) otherwise seriously jeopardizing the investigation. One of the reasons for this request is that if the target(s) of the investigation were to learn of the investigation they could destroy evidence, change patterns of behavior, seek to hide their identity, or take further steps to flee from prosecution and avoid contact with law enforcement authorities. Furthermore, the search warrant application sets forth detailed information about the status of the investigation, which, if revealed, would compromise the ongoing investigation. For example, users of any accounts involved in this investigation may cease using those accounts and begin

using other accounts or aliases in connection with their illicit activities. In addition, while steps have been taken in this application to keep the identity of any individuals who have provided information to law enforcement confidential, the details contained in this application are likely to be sufficient to allow the identity to be discovered, both risking harm to the CHS as well as jeopardizing the ongoing investigation.

**VI.   SERVICES PROVIDED BY APPLE, INC.**

26.   Based on a review of information provided by Apple regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Apple.

27.   Apple is a United States consumer electronics company that produces devices, including the iPhone, iPad, and iPod Touch, Apple Watch, and Apple TV all of which use Apple operating system software (including iOS, iPadOS, watchOS, and tvOS)the iOS operating system, and desktop and laptop computers based which use on the Mac OS operating system.

28.   Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

       a.   Apple provides email service to its users through email addresses at the domains mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate with each other in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls. The iMessage and FaceTime services are exclusive to Apple devices.

c.    iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store Apple device backups and data associated with third-party apps.

d.    iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit

card information, and Wi-Fi network information synchronized
across multiple Apple devices. iCloud can also be used to back
up various settings and history of a user's activity, such as
searches and web history.

> e.  Game Center, Apple's social gaming network,
allows users of Apple devices to play and share games with each
other.

> f.  Find My allows owners of Apple devices to
remotely identify and track the location of, display a message
on, and (in some instances) wipe the contents of devices
registered with the service.

> g.  Location Services allows apps and websites to use
information from cellular, Wi-Fi, Global Positioning System
("GPS") networks, and Bluetooth, to determine a user's
approximate location.

> h.  The App Store and iTunes Store are used to
purchase and download digital content. Apps can be purchased and
downloaded through the App Store on Apple devices, or through
iTunes Store on desktop and laptop computers running either
Microsoft Windows or Mac OS. Additional digital content,
including music, movies, and television shows, can be purchased
through iTunes Store.

29.  Apple services are accessed through use of an "Apple
ID," an account created during the setup of an Apple device or
through the iTunes or iCloud services. A single Apple ID can be
linked to multiple Apple services and devices, serving as a
central authentication and syncing mechanism.

30.   An Apple ID takes the form of the full email address
submitted by the user to create the account; it can later be
changed. Users can submit an Apple-provided email address (often
ending in @icloud.com, @me.com, or @mac.com) or an email address
associated with a third-party email provider (such as Gmail,
Yahoo, or Hotmail). The Apple ID can be used to access most
Apple services (including iCloud, iMessage, and FaceTime) only
after the user accesses and responds to a "verification email"
sent by Apple to that "primary" email address. Additional email
addresses ("alternate," "rescue," and "notification" email
addresses) can also be associated with an Apple ID by the user.

31.   Apple captures information associated with the
creation and use of an Apple ID. During the creation of an Apple
ID, the user must provide basic personal information including
the user's full name, physical address, and telephone numbers.
The user may also provide means of payment for products offered
by Apple. The subscriber information and password associated
with an Apple ID can be changed by the user through the "My
Apple ID" and "iForgot" pages on Apple's website. In addition,
Apple captures the date on which the account was created, the
length of service, records of log-in times and durations, the
types of service utilized, the status of the account (including
whether the account is inactive or closed), the methods used to
connect to and utilize the account, the Internet Protocol
address ("IP address") used to register and access the account,
and other log files that reflect usage of the account. Because
every device that connects to the Internet must use an IP

address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

32.   Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

33.   Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an Apple device, Apple captures and retains the user's IP address and identifiers (depending on the type of device) such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to

play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

34.  Apple provides users with five gigabytes of free storage space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

35.   In some cases, users may communicate directly with
Apple about issues relating to their accounts, such as technical
problems, billing inquiries, or complaints from other users.
Providers like Apple typically retain records about such
communications, including records of contacts between the user
and the provider's support services, as well as records of any
actions taken by the provider or user as a result of the
communications.

36.   In my training and experience, evidence of who was
using an Apple ID and from where, and evidence related to
criminal activity of the kind described above, may be found in
the files and records described above. This evidence may
establish the "who, what, why, when, where, and how" of the
criminal conduct under investigation, thus enabling the United
States to establish and prove each element or, alternatively, to
exclude the innocent from further suspicion.

37.   For example, the stored communications and files
connected to an Apple ID may provide direct evidence of the
offenses under investigation. Based on my training and
experience, instant messages, emails, voicemails, photos,
videos, and documents are often created and used in furtherance
of criminal activity, including to communicate and facilitate
the offenses under investigation.

38.   In addition, the user's account activity, logs, stored
electronic communications, and other data retained by Apple can
indicate who has used or controlled the account. This "user
attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

39.   Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

40.   Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from the App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can

lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

41.   Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

### VII. <u>CONCLUSION</u>

42.   Based on the foregoing, I request that the Court issue the requested warrant. The government will execute this warrant by serving the warrant on the PROVIDER. Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
_____, 2021.


_____
UNITED STATES MAGISTRATE JUDGE